JAMES L. WINOKUR AND SARA M. WINOKUR, PETITIONERS
*v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 143-85.          Filed April 21, 1988.

*Robert J. Dodds, III*, for the petitioners.
*Russell F. Kurdys*, for the respondent.

SWIFT, *Judge*: In a timely statutory notice of deficiency and in an amended answer, respondent determined deficiencies in petitioners' 1977, 1978, and 1979 joint Federal income tax liabilities, as follows:

| Year | Deficiency |
| --- | --- |
| 1977 | $13,238.08 |
| 1978 | 17,688.45 |
| 1979 | 15,191.81 |

Respondent also determined in his amended answer that the underpayments of tax constitute substantial underpayments attributable to tax-motivated transactions under section 6621(d), now section 6621(c).[1]

The issues for decision are: (1) Whether petitioners are entitled to charitable contribution deductions with regard to undivided interests in 44 works of art donated to a charitable organization; (2) the value of eight paintings and one sculpture; and (3) whether the underpayments herein are substantial underpayments attributable to tax-motivated transactions under section 6621(c).

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as in effect during the years in issue.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. Petitioners resided in Pittsburgh, Pennsylvania, at the time they filed their petition. Petitioners timely filed joint Federal income tax returns for each of the years in issue. Petitioners subsequently divorced, and all references to "petitioner" are to James L. Winokur.

Over the course of 30 years, petitioner acquired an extensive collection of fine art. He also was involved in the management and activities of the Museum of Art, Carnegie Institute, in Pittsburgh, Pennsylvania. Petitioner served as a trustee of the Carnegie Institute and participated in its art acquisition program. Petitioner donated many works of art to the Carnegie Institute and to other museums throughout the United States. The Carnegie Institute is a qualifying tax-exempt organization under section 501(c)(3).

On December 28, 1977, petitioner donated to the Carnegie Institute a 10-percent undivided interest in a collection of 44 works of art, including paintings, drawings, and sculptures, by three Scandinavian artists. The artists (namely, Raoul Ubac, Carl-Henning Pedersen, and Pierre Alechinsky) were members of the COBRA school of European art. COBRA is an acronym based on the European cities of Copenhagen, Brussels, and Amsterdam. COBRA artwork generally is subjective, expressionistic, and abstract. The COBRA school was formed in 1948 by the painter Asger Jorn and the poet Christian Dotremont. The activities of the COBRA school were centered in Paris from 1948 through 1951.

The deed of gift reflecting the December 28, 1977, donation provided, among other things, that the Carnegie Institute had the right to possession of the works of art for a specified number of days of each year following the donation. The deed of gift provided, in relevant part, as follows:

The Donee, by signing this Deed of Gift at the end, hereby accepts and acknowledges receipt of the Interest and becomes and is entitled to possession of the Collection for that number of days during any twelve month period after the date hereof which the value of the Interest bears to the value of the Collection. The Donee shall have sole discretion to decide the days during which it shall have possession of the Collection.

During the 12 months following December 28, 1977, the Carnegie Institute did not take physical possession of any of the 44 individual works of art in which it had received an undivided 10-percent interest from petitioner.

Petitioner donated to the Carnegie Institute another 10-percent undivided interest in the same 44 works of art by deed of gift dated December 7, 1978. This deed of gift contained identical language concerning the Institute's right to possession of the works of art that was in the 1977 deed of gift. During the 12-month period following December 7, 1978, the Carnegie Institute did not take physical possession of any of the 44 individual works of art.

On December 18, 1979, petitioner donated to the Carnegie Institute his remaining 80-percent interest in five of the works of art. The Carnegie Institute took physical possession of those five works of art on December 18, 1979. Petitioner made no donation to the Carnegie Institute in 1979 of additional undivided interests in the other 39 works of art with respect to which undivided interests had been donated in 1977 and 1978.

On their 1977, 1978, and 1979 joint Federal income tax returns, petitioners claimed the following charitable contribution deductions with respect to the undivided interests in the 44 works of art petitioner had contributed to the Carnegie Institute in each year:

| Year | Charitable contribution deduction |
|------|-----------------------------------|
| 1977 | $35,700 |
| 1978 | 35,343 |
| 1979 | 57,381 |

The amount of the charitable contribution deduction claimed for 1977 was based on 10 percent of the $357,000 total value petitioner placed on the 44 works of art. After deducting $35,700 as the value for the 10-percent interest donated in 1977, the value of petitioner's retained 90-percent interest in the works of art was determined by petitioner to be $321,300 ($357,000 minus $35,700 equals $321,300).

In calculating the amount of the charitable contribution deduction claimed on petitioners' 1978 joint income tax return, petitioner increased for inflation the value of his 90-percent interest in the 44 works of art by 10 percent. Accordingly, as of December 7, 1978, petitioner's 90-percent interest in the works of art was valued at $353,430, and petitioner's charitable contribution deduction for 1978 was calculated on that basis (namely, 10 percent of $353,430, or $35,343).

The $57,381 charitable contribution deduction claimed on petitioners' 1979 joint income tax return was calculated on the basis of petitioner's calculation of the fair market value of his 80-percent undivided interest in the five works of art that he donated to the Carnegie Institute in that year. From the total value placed on the five works of art in December of 1977, petitioner subtracted the amount claimed as deductions on petitioners' 1977 and 1978 joint Federal income tax returns with respect to the respective 10-percent undivided interests therein that were donated in those years. Inflation adjustments of 10 percent for 1978 and 15 percent for 1979 were made, and the total value as of December 18, 1979, of petitioner's 80-percent interest in the five works of art was determined by petitioner to be $57,381.

Respondent determined that petitioner's donations in 1977 and 1978 of the 10-percent undivided interests did not qualify as charitable contribution deductions in those years because the Carnegie Institute did not take physical possession of any of the works of art during any portion of the 12-month period immediately following each of the donations. Respondent also determined that petitioner overvalued nine of the works of art. No dispute exists as to the value of the other 35 works of art (nor to the value of the undivided interests therein) donated by petitioner to the Carnegie Institute in 1977, 1978, and 1979. The following schedule reflects the respective values sought by the parties for the nine works of art the values of which are disputed, the year (where known) in which petitioner acquired each work of art, and petitioner's acquisition price.

| Artist and title of artwork | Year of acquisition | Acquisition price | Petitioner's claimed value | Respondent's claimed value |
|---|---|---|---|---|
| Raoul Ubac: | | | | |
| Untitled | 1967 | $1,250 | $50,000 | $5,000 |
| Carl-Henning Pedersen: | | | | |
| Red and Black | - - - | (1) | 25,000 | 10,000 |
| Red Space | - - - | (2) | 25,000 | 10,000 |
| Tree of Life | 1970 | 7,000 | 40,000 | 15,000 |
| Red Houses Under a Blue Sky | - - - | 2,500 | 15,000 | 7,500 |
| Untitled and Fairy Picture with Bird[3] | 1956 | 800 | 50,000 | 20,000 |
| Untitled | - - - | 5,000 | 20,000 | 10,000 |
| Pierre Alechinsky: | | | | |
| Savage State | 1971 | 7,050 | 20,000 | 5,000 |
| Total | | | 245,000 | 92,500 |

[1]Petitioner traded a painting which he had purchased in 1969 for $5,800.
[2]Petitioner traded a painting which he had purchased in 1961 for $1,800.
[3]These are two oil paintings on opposite sides of a single board.

Respondent determined that, if not disallowed on other grounds, the total charitable contribution deductions for 1977, 1978, and 1979, to which petitioner is entitled with respect to the undivided interests in the 44 works of art are respectively $20,450, $20,450, and $8,800.

OPINION

*Charitable Contribution Deductions for 1977 and 1978*

Section 170[2] permits a deduction for contributions to qualifying charitable organizations that are paid within the taxable year. Contributions that constitute an "undivided portion of the donor's entire interest in property" qualify as charitable contribution deductions under section 1.170A-7(b)(1), Income Tax Regs. The regulations specify, however, that a contribution of an undivided interest will only qualify for a charitable contribution deduction where the donee

---

[2]Sec. 170(a)(1) provides as follows:

SEC. 170. CHARITABLE, ETC., CONTRIBUTIONS AND GIFTS.

(a) ALLOWANCE OF DEDUCTION.—

(1) GENERAL RULE.—There shall be allowed as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year. A charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary.

organization is given the right, as a tenant in common with the donor, to possession, dominion, and control of the property contributed for the portion of each year that is equal to the organization's undivided interest in the property. Section 1.170A-7(b)(1), Income Tax Regs., provides, in relevant part, as follows:

(1) *Undivided portion of donor's entire interest.*

(i) A deduction is allowed under section 170 for the value of a charitable contribution not in trust of an undivided portion of a donor's entire interest in property. An undivided portion of a donor's entire interest in property must consist of a fraction or percentage of each and every substantial interest or right owned by the donor in such property and must extend over the entire term of the donor's interest in such property and in other property into which such property is converted. * * * A deduction is allowed under section 170 for a contribution of property to a charitable organization whereby such organization is given the right, as a tenant in common with the donor, to possession, dominion, and control of the property for a portion of each year appropriate to its interest in such property. * * *

Consistent with the above requirements, a charitable contribution deduction is not allowed for a ˇdonation of a future interest in tangible personal property. Sec. 170(a)(3).[3] A future interest is described in the regulations as a donation "in which a donor purports to give tangible personal property to a charitable organization, but has an understanding, arrangement, agreement, etc., whether written or oral, with the charitable organization which has the effect of reserving to, or retaining in, such donor a right to the use, possession, or enjoyment of the property." Sec. 1.170A-5(a)(4), Income Tax Regs.

Section 1.170A-5(a)(2), Income Tax Regs., provides that a transfer of an undivided present interest in property will not be treated as a transfer of a future interest and will not be disallowed under section 170(a)(3) if the "period of initial possession by the donee [is not] deferred in time for more than one year." Section 1.170A-5(a)(2), Income Tax Regs.,

---

[3]Sec. 170(a)(3) provides as follows:

(3) FUTURE INTERESTS IN TANGIBLE PERSONAL PROPERTY.—For purposes of this section, payment of a charitable contribution which consists of a future interest in tangible personal property shall be treated as made only when all intervening interests in, and rights to the actual possession or enjoyment of, the property have expired or are held by persons other than the taxpayer or those standing in a relationship to the taxpayer described in section 267(b). For purposes of the preceding sentence, a fixture which is intended to be severed from the real property shall be treated as tangible personal property.

also includes an example illustrating a donation of an undivided present interest in a work of art that would qualify for a charitable deduction, as follows:

(2) Section 170(a)(3) and this section have no application in respect of a transfer of an undivided present interest in property. For example, a contribution of an undivided one-quarter interest in a painting with respect to which the donee is entitled to possession during three months of each year shall be treated as made upon the receipt by the donee of a formally executed and acknowledged deed of gift. However, the period of initial possession by the donee may not be deferred in time for more than one year.

Petitioner argues that the value of the 10-percent undivided interests in the works of art that he donated to the Carnegie Institute in 1977 and 1978 is deductible under section 1.170A-7(b)(1), Income Tax Regs., because the interests donated represent undivided portions of his entire interest in the 44 works of art. Petitioner also argues that under the deeds of gift dated December 28, 1977, and December 7, 1978 (which gave the Carnegie Institute the right to possession of the donated works of art for a portion of each year following the gifts), petitioner and the Carnegie Institute share the donated interests as tenants in common.

Respondent argues that petitioner's donations in 1977 and 1978 of undivided interests in the works of art do not qualify as undivided present interests because the Carnegie Institute did not take physical possession of the works of art for any portion of the years immediately following the donations. Respondent therefore contends that petitioner's donations are future interests of tangible personal property which, under section 170(a)(3), are not deductible.

No cases have addressed the issue before us. The relevant statutory and regulatory language suggest, among other things, that it is the right or entitlement to possession, not actual physical possession, that controls whether a purported present interest will be regarded as a future interest. Section 170(a)(3), speaks of "rights to the actual possession." Section 1.170A-7(b)(1), Income Tax Regs., quoted above, speaks of "right" to possession. The example set forth in section 1.170A-5(a)(2), Income Tax Regs., also quoted above, speaks of "entitlement" to possession. Petitioner's donations are very similar to the donation of an

undivided interest described in the regulations as a qualifying charitable deduction.

Neither the statute nor the regulations require the donee organization to take physical possession of the donated property during the year immediately following the gift. In order for an undivided interest to be treated as a present interest and not as a future interest, the donee simply must have the right to interrupt the donor's possession and the right to have physical possession of the property during each year following the donation, equivalent to its undivided interest in the property, in addition to the other rights of a tenant in common.

Petitioner transferred such rights to the Carnegie Institute in 1977 and 1978. Under the deeds of gift, the Carnegie Institute unequivocally was given the right to possess and control the works of art for a portion of each of the years following the donations, equivalent to its undivided ownership interest in the works of art. There is no evidence that petitioner deprived the Carnegie Institute of the right of common possession and enjoyment thereof. Apparently, the Carnegie Institute's failure to take physical possession of many of the individual works of art has been voluntary and has not been caused by acts of petitioner.[4] In our view, petitioner and the Carnegie Institute shared the works of art as tenants in common. Accordingly, petitioner's donations of the 10-percent undivided interests in 1977 and 1978 qualify as charitable contribution deductions under section 170.

## Valuation as of December 1977

When a taxpayer makes a donation of property other than money to a qualified charitable organization, a deduction is allowed in the amount of the fair market value of the property on the date of the contribution. Sec. 1.170A-1(c)(1), Income Tax Regs. "Fair market value" is defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having a reasonable

---

[4]The evidence does not indicate that any side agreement existed between petitioner and the Carnegie Institute to the effect that the Carnegie Institute would not take possession of the works of art for the portion of each year represented by its partial ownership interests therein.

knowledge of relevant facts." Sec. 1.170A-1(c)(2), Income Tax Regs.; *United States v. Cartwright*, 411 U.S. 546, 551 (1973). Respondent's regulations expressly make this definition of fair market value applicable to the valuation of undivided interests in property donated to charity. Sec. 1.170A-7(c), Income Tax Regs. The fair market value of property raises a question of fact that must be resolved on the basis of all of the relevant evidence. *Estate of Andrews v. Commissioner*, 79 T.C. 938, 940 (1982).

The process of determining fair market value in the context of litigation is particularly unsatisfying. Each party typically produces expert witnesses who purport to discern the precise valuation formula that should be used in a particular case, and each expert testifies with apparent confidence as to exactly what is wrong with the other expert's approach. We previously have lamented as follows:

Too often in valuation disputes the parties have convinced themselves of the unalterable correctness of their positions and have consequently failed successfully to conclude settlement negotiations—a process clearly more conducive to the proper disposition of disputes such as this. The result is an overzealous effort, during the course of the ensuing litigation, to infuse a talismanic precision into an issue which should frankly be recognized as inherently imprecise and capable of resolution only by a Solomon-like pronouncement. * * * [*Messing v. Commissioner*, 48 T.C. 502, 512 (1967).]

The opinions of expert witnesses generally are helpful, as they have been in this case. Those opinions, however, must be given proper weight in light of all of the evidence, and we must evaluate the care and thoughtfulness with which their reports were prepared. *Silverman v. Commissioner*, 538 F.2d 927, 933 (2d Cir. 1976), affg. a Memorandum Opinion of this Court.

As stated, the experts herein provided much helpful testimony. Petitioner is an individual with a long and established reputation and expertise in, and devotion to, the specific artists who created the works in question. He has collected their works for over 40 years. He has been an art critic and lecturer. He has assisted the Carnegie Institute in purchasing and obtaining donations of works of art. He testified as an expert on his own behalf in this case, and we

find it difficult to reject his opinion in spite of his interest in the outcome.

The testimony of Karen Carolan, respondent's expert witness, also was credible and persuasive. She is the chairperson of respondent's Art Advisory Panel[5] and has previously testified before this Court as an expert witness on the value of works of art. We also find it difficult to reject Ms. Carolan's opinion as to the value of the works of art.

Our analysis boils down to an identification and analysis of the major factors relied on by each expert and to a weighing of the significance of those factors on the value of each work of art.

### Raoul Ubac's Sculpture:
### Petitioner $30,000—Respondent $5,000

As indicated, petitioner computed the amount of the charitable contribution deduction claimed with respect to the Ubac sculpture on the basis of a total value therefor of $50,000. At trial, petitioner contends that the value of the sculpture is $30,000 and that the percentage interests therein that he donated in 1977, 1978, and 1979, and the annual inflation adjustments thereto, should be calculated on the basis of the revised $30,000 figure.

Ubac's sculpture work typically is done in slate blocks of varying sizes on which abstract designs are engraved with a nail. The sculpture process is slow and laborious, and there are only approximately 100 Ubac slate sculptures in existence. In 1964, Ubac was commissioned to do a series of 14 slate sculptures, for a chapel in southern France, depicting the Stations of the Cross. The sculpture in question is a 15th sculpture that was completed by Ubac as a replacement for any of the other 14 slate sculptures, in the event one of them is ever broken. The sculpture is approximately 11⅛ by 12 inches.

---

[5]Respondent's Art Advisory Panel convenes at the Internal Revenue Service in Washington, D.C., two times each year and determines a value for all works of art with a value in excess of $20,000 as claimed by taxpayers on their Federal income tax returns. Respondent's Art Advisory Panel includes museum curators, museum directors, art scholars, art dealers, and members of distinguished auction houses. Members of the Art Advisory Panel are not compensated for their services, but are reimbursed for their travel expenses and are paid per diem. The members of the Art Advisory Panel serve 2-year terms. See 2 F. Feldman & S. Weil, Art Law, sec. 13.3, at 573-575 (1986).

Petitioner argues that the Ubac sculpture should be valued significantly higher than the prices at which two Ubac sculptures were sold in the late 1970's because of its unique association with Ubac's *Stations of the Cross*, his most important work. Respondent argues that the subject sculpture's association with the *Stations of the Cross* justifies no particular premium and that its value should be governed by the limited information we have on sales of other Ubac sculptures.

On November 19, 1975, a 3- by 5-inch Ubac slate sculpture sold for $368. On November 3, 1978, a 12- by 11-inch Ubac slate sculpture sold for $2,000. On October 27, 1982, a Ubac slate sculpture of a man's torso, 32 by 24 inches in size, sold for $17,400. On March 25, 1984, a 32- by 24-inch Ubac slate sculpture sold for $5,000.

On the facts before us, we cannot justify a value for the subject Ubac sculpture of more than $15,000 on December 28, 1977. That amount is within the range of the other Ubac sculptures used by respondent to make his analysis, and in our opinion, it also reflects a significant premium to account for petitioner's testimony that the subject sculpture has unique value because of its association with Ubac's *Stations of the Cross*.

### *Carl-Henning Pedersen's Seven Paintings:* *Petitioner $175,000—Respondent $72,500*

Carl-Henning Pedersen is a contemporary Danish artist. Petitioner is personally acquainted with Pedersen and with all of his work. For many years, Pedersen's paintings were offered for sale only on a limited and sporadic basis. A high percentage of his available paintings apparently are sold at private sales, not through auctions. A December 8, 1961, issue of Time magazine described the difficulty during the 1960's of purchasing Pedersen's paintings, as follows:

Carl-Henning Pedersen is the best painter in Denmark—and for art dealers the most frustrating. He has about 1,000 canvases stashed away in the storerooms of a Copenhagen brewery, and he turns as frosty as a glass of Carlsberg when anyone suggests that he might sell one. He recently refused a substantial check for 15 paintings because he said it would raise his standard of living, so he simply gave the paintings away. He is indifferent to what the critics say, and dealers who try to see him

at his lonely house on the west coast of Jutland seldom get inside the door. [Time, Dec. 8, 1961, at 72, col. 2.]

In 1969, a large painting by Pedersen was purchased by the Carnegie Institute for $30,000. In 1975, the Government of Denmark agreed to build a museum to exhibit all of Pedersen's paintings then in his possession. Approximately 1,000 of Pedersen's paintings and 2,000 of his watercolors were transferred to the Government as a result of this agreement. The museum that was built is located in Herning, Denmark, and is known as the Carl-Henning Pedersen and Else Alfelt Museum. Else Alfelt is Pedersen's wife and also is an artist.

A 1975 price list from the Galerie Mark in Zurich, on which both experts rely, indicates that paintings by Pedersen were being offered for sale in the range of $13,800 to $20,000 each. In 1982, the Lefebre Gallery in New York was asking approximately $28,000 for Pedersen paintings.

Price information was submitted by respondent with respect to 15 of Pedersen's paintings sold between 1974 through 1984. The sales prices for these paintings ranged from $2,000 to $13,200. Twelve of the sales were auction sales, which petitioner argues are not good indications of value because most of Pedersen's paintings are sold through private sales. Petitioner also argues that the paintings in question herein represent Pedersen's earlier work and generally are of a higher quality then those sold through auctions. Respondent, using the auction prices and comparing the size of each Pedersen painting, for which we have a specific sales price, to the size of the paintings in issue, determined his value for each painting at issue.

Based on our analysis of the above factors, we determine the following values for each of the seven Pedersen paintings in issue as of December 28, 1977:

| Title of painting | Value |
|---|---|
| Red and Black | $15,000 |
| Red Space | 15,000 |
| Tree of Life | 25,000 |
| Red Houses Under a Blue Sky | 10,000 |
| Untitled and Fairy Picture with Bird | 30,000 |
| Untitled | 15,000 |
| Total | 110,000 |

### Pierre Alechinsky's "Savage State": Petitioner $20,000—Respondent $15,000

Petitioner is personally familiar with all of the work of Pierre Alechinsky. *Savage State* is the last work in oil by Alechinsky. Respondent points to two sales of similarly sized oil paintings by Alechinsky in 1977 for $25,910 and $14,620 and to a larger Alechinsky oil painting sold in 1978 at a New York City auction for $18,000. In 1978, the Carnegie Institute purchased a larger acrylic painting by Alechinsky for $75,000. Sixty-five Alechinsky paintings sold at auction between 1975 and 1984. Two of those paintings sold for more than $25,000, and those sales occurred in 1984, seven years after the valuation date in this case.

In light of petitioner's close familiarity with the work of this artist and taking into account the other evidence, we conclude that this painting had a value in December of 1977 of $20,000.

### Valuation as of December 1978 and 1979

Also in dispute is the valuation of the undivided interests in the same nine works of art as of December 1978, and the valuation of the 80-percent interest in the Ubac slate sculpture as of December 1979. Petitioner has valued the works of art in dispute (and the undivided interests therein) as of December 1978 and December 1979 by taking his December 1977 values therefor and adding a 10-percent inflation adjustment for 1978 and a 15-percent inflation adjustment for 1979. Respondent's expert witness report does not fault petitioner's annual inflation adjustments. In fact, respondent's expert witness report only values the works of art in question as of December 1977. No opinion is offered by respondent's expert witness in her report with regard to the value of the works of art (or of the undivided interests therein) as of December 1978 or December 1979. Under these circumstances, we conclude that petitioner's annual adjustments for inflation are sustained.

The eight paintings are to be valued as of December 1978 and the Ubac sculpture is to be valued as of December 1979 based upon their values determined herein as of December 1977, with appropriate adjustments (as made by petitioner)

for the undivided interest(s) donated in the prior year(s) and for the inflation adjustments used by petitioner.

### Section 6621(c) Increased Interest Rate

Section 6621(c) provides an increase in the interest rate due on underpayments of tax where there is a substantial underpayment (an underpayment of at least $1,000) in any taxable year that is "attributable to tax motivated transactions." Sec. 6621(c)(1) and (2). A "tax motivated transaction" is defined as including "any valuation overstatement" as defined in section 6659(c). Sec. 6621(c)(3)(A)(i). Under section 6659(c), a valuation overstatement is present if the value of any property claimed on a return is 150 percent or more of the amount determined to be the correct valuation of such property.

The charitable contribution deductions claimed by petitioners in 1977, 1978, and 1979, the amounts allowable based upon our findings herein, the amounts by which petitioners overstated those deductions, and the percentages of the overstatements are as follows:[6]

| Year | Amount claimed | Amount allowable | Amount overstated | Percentage overstated |
|------|------|------|------|------|
| 1977 | $35,700 | $25,700 | $10,000 | 139% |
| 1978 | 35,343 | 25,443 | 9,900 | 139 |
| 1979 | 57,381 | ,21,518 | 35,863 | 267 |

Based on the above, a valuation overstatement is present only for 1979. Because the amount of the valuation overstatement that occurred in 1979 obviously resulted in a tax underpayment in excess of $1,000, respondent's addition to tax under section 6621(c) is sustained for that year.

Based on the foregoing,

*Decision will be entered under Rule 155.*

---

[6]In his notice of deficiency, respondent computes the valuation overstatements by lumping the 44 works of art together and determining only the net overstatement. Respondent herein does not request that the valuation overstatements be computed on the basis of each separate work of art. We express no opinion as to the manner in which these computations should be made in another case.