KARL EASTON AND JACQUALINE EASTON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
EASTON v. COMMISSIONER
Docket No. 29540-88
United States Tax Court
T.C. Memo 1991-461; 1991 Tax Ct. Memo LEXIS 510; 62 T.C.M. (CCH) 773; September 23, 1991, Filed *510 Decision will be entered under Rule 155. Karl Easton and Jacqualine Easton, pro se. Karen A. Holmes, for the respondent. GERBER, Judge. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION By a statutory notice of deficiency, respondent determined deficiencies in and additions to petitioners' Federal income taxes and increased interest in the following amounts: Addition to Tax
Increased Interest
Year
Deficiency
Sec. 6659 [1]
Sec. 6621(c)
1980 $ 29,941
--
--
1981 $ 21,932 $ 6,580 *
1982 $ 29,931 $ 8,979 *
Respondent asserted an addition to tax under section 6661, in the alternative to the section 6659 addition to tax for the taxable year 1982. After concessions, the *511 issues presented for our consideration are: 1. Whether the fair market value of a business enterprise petitioners contributed to charity exceeds the amount determined by respondent; 2. Whether petitioners are liable for the addition to tax under section 6659 for taxable years 1981 and 1982; 3. Alternatively, whether petitioners are liable for the section 6661 addition to tax for taxable year 1982; and 4. Whether petitioners are subject to the increased interest rate under section 6621(c) attributable to their underpayments for the 1981 and 1982 taxable years. FINDINGS OF FACT The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioners Karl Easton and Jacqualine Easton, husband and wife, resided in Craryville, New York, at the time their petition in this case was filed. Petitioners filed their joint Federal income tax returns for the taxable years 1980, 1981, and 1982 with the Internal Revenue Service in Holtsville, New York. On March 23, 1983, petitioners filed an amended Federal income tax return (Form 1040X) for the 1980 taxable year in which they claimed a net operating loss carryover from 1979 in the amount of *512 $ 72,409. [2] Respondent mailed a notice of deficiency for 1980, 1981, and 1982 on August 16, 1988. The deficiencies determined by respondent arise in connection with the value of a charitable contribution by petitioner wife of a community residence program, named Boerum Hill Rehabilitation Residence. Background
During 1966, petitioner husband resigned his government position as the director of psychiatry for the Department of Welfare in New York to develop a community residence center for formerly hospitalized mentally ill patients. Petitioner husband leased a 200-room building located at 50 Nevins Street, Brooklyn, New York, from his family-owned real estate corporation for the community residence program. Petitioner husband also was the director of a nonprofit vocational rehabilitation services operation at the same location. Initially, petitioners owned and operated a single proprietary community residence. *513 Government funding was not available because the community residence program was operated as a for-profit enterprise. Petitioner husband envisioned the eventual formation of a comprehensive psychosocial rehabilitation center, which combined residential services with social rehabilitation services, and established the nonprofit vocational rehabilitative operation to provide the requisite social rehabilitative services. Petitioner husband believed that the operation of the program through a nonprofit organization would generate additional income because, as a nonprofit organization, government funding was available. The community residence program was gifted to the nonprofit vocational rehabilitative operation. At all relevant times, petitioners retained a financial interest in the community residence program by petitioner husband's receipt of a consultant's fee. Petitioners also derived economic benefit from rental income from the family-owned real estate corporation. For example, during 1979, the family real estate corporation earned approximately $ 300,000 rental income by leasing property to the program. The Community Residence Program
After petitioner husband resigned *514 his government position in 1966, he formed Cobble Hill Center Corporation (Cobble Hill, which was owned and operated by petitioners), a real estate corporation. Petitioner husband was the chief executive officer and petitioners were the only officers of Cobble Hill. From January 1967 through October 1967, Cobble Hill shares of stock were owned by petitioner husband (22 shares) and petitioners' three children (6 shares each). Thereafter, petitioner gifted his 22 shares to his three children for estate tax planning purposes. Cobble Hill formed and operated a community residence program, named Cobble Hill Center (Center). [3] For all relevant years, petitioners leased a 200-room building from Cobble Hill for the community residence program. The annual rent paid to Cobble Hill was $ 176,400 for the initial year with an inflation-adjusted rent for subsequent years. There was no governmental support for the program because it was operated by a business corporation, Cobble Hill. To remedy this, petitioner husband applied for certification to the New York State Board of Social Welfare in 1969 to operate Center as a proprietary home for adults with petitioner wife taking on an active *515 role as proprietor. Petitioner wife did not receive a salary, but profits from the proprietorship were deposited into petitioners' joint account. After certification, the name was changed to Boerum Hill Home for Adults (Boerum Hill). Petitioner husband was founder and also served as a paid consultant to Boerum Hill from 1970 through 1980. In 1973, Boerum Hill applied to New York State, under the regulatory authority of the Department of Mental Hygiene, to operate as a for-profit program. The name of the program was changed to Boerum Hill Rehabilitation Residence (Boerum Hill Rehab), and petitioner wife continued to operate it as a proprietor. Boerum Hill Rehab was to provide residents with a rehabilitative psychiatric environment, greater care than that provided by programs not requiring intensive psychiatric treatment. Boerum Hill Rehab's *516 profits were derived primarily from the residents' rental payments. Because Boerum Hill Rehab was operated as a profit-making enterprise, it was not eligible for medicaid or other government funding. Boerum Hill Rehab was hampered by the lack of government funding in its endeavor to become a rehabilitative psychiatric program. The gross receipts and pretax profits/losses of Boerum Hill Rehab were reported on petitioners' Schedule C of their joint Federal income tax returns for the taxable years 1975 through 1979 as follows: Gross
Pretax
Year
Receipts
Profits/Losses
1975
$   976,200
$ 52,962 1976
992,625
47,404 1977
901,826
19,119 1978
1,079,626
70,746 1979
1,012,809
(79,336)
The Nonprofit Rehabilitation Services Operation
During 1967, Brooklyn Vocational Rehabilitation Institute, Inc. (BVRI), was organized as a New York State not -for-profit corporation to provide vocational rehabilitation services to persons with psychiatric handicaps, social handicaps, or mental disabilities and to operate community residences for mentally disabled persons. Petitioner husband was BVRI's executive director. The board of directors was comprised of six personal *517 friends of petitioner husband. BVRI leased Cobble Hill property. BVRI owned the Lafayette Center, an outpatient facility which provided psychiatric services to Boerum Hill Rehab residents. Petitioner husband was the medical director of the Lafayette Center from about 1978 through October 20, 1986. Lafayette Center's operating certificate authorized medicaid funding. Lafayette Center leased a building owned by 3 Lafayette Ave. Corp., a subsidiary of Cobble Hill. The Gift of Boerum Hill Rehab to BVRI
Petitioner wife gifted Boerum Hill Rehab to BVRI by means of a letter dated July 2, 1979. After the gift, petitioner wife retired and received no further compensation from Boerum Hill Rehab. BVRI amended its certificate of incorporation and changed its name to Brooklyn Psychosocial Rehabilitation Institute, Inc. (BPRI). BVRI agreed to change its operating charter and receive as a gift all of Boerum Hill Rehab's equipment, furniture, fixtures, leasehold improvements, and all other fixed and current assets as of January 1, 1980. BVRI also agreed to accept all liabilities, including accounts payable, refunds due to the Welfare program, *518 Federal, State and local income and unincorporated business taxes. On January 1, 1980, the fair market value of Boerum Hill Rehab's tangible assets was $ 100,000. During 1979, petitioner husband was executive director of BPRI. On December 31, 1979, petitioner husband was also appointed (by BPRI's board of directors) to act as a consultant to the board. Under N.Y. Mental Hyg. Law sec. 31.02 (McKinney 1988), a community residence for the mentally ill cannot be operated unless an operating certificate has been issued by the commissioner of mental health and a certificate cannot be transferred. On March 14, 1980, the State of New York Office of Mental Health issued an operating certificate to BPRI authorizing it to operate the community residence/supervised living facility with a certified 196-bed capacity. As a not-for-profit organization, BPRI was eligible for funding under N.Y. Mental Hyg. Law sec. 41.33 (McKinney 1988) (hereinafter referred to as section 41.33 funding), by its ownership and operation of Boerum Hill Rehab, but had to receive the approval of State and local governments. In a September 12, 1979, letter to the State of New York Office of Mental Health, petitioner *519 husband indicated that he did not anticipate applying for section 41.33 funding and hoped to continue operations primarily with income derived from residents' payments. However, BPRI eventually applied for section 41.33 funding, which was not approved. Medicaid funding became available, however, through Lafayette Center's servicing of Boerum Hill Rehab patients. On petitioners' 1980, 1981, and 1982 Federal income tax returns, they claimed that the fair market value of the gift of Boerum Hill Rehab was $ 680,120. Petitioners claimed charitable contribution deductions for the taxable years 1980, 1981, and 1982 in the amounts of $ 73,410, $ 44,600, and $ 53,339, respectively. In his notice of deficiency for 1980, 1981, and 1982, respondent disallowed petitioners' claimed charitable contribution deductions, asserting that the fair market value of Boerum Hill Rehab at the time of the gift was $ 100,000. OPINION We must decide the fair market value of the Boerum Hill Rehab program for purposes of determining petitioners' charitable contribution deduction. Section 170 allows a deduction for any charitable contribution made during the taxable year. A charitable contribution is a *520 contribution or gift to or for the use of an organization described in section 170(c). There is no question as to whether BPRI qualified as a charitable organization under section 170. Petitioners are entitled to claim as charitable contributions the fair market value of property (Boerum Hill Rehab) at the time of the donation. Sec. 1.170A-1(c)(1), Income Tax Regs. Fair market value is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having a reasonable knowledge of relevant facts." Sec. 1.170A-1(c)(2), Income Tax Regs. Fair market value is a question of fact to be determined by examination of the entire record. Skripak v. Commissioner, 84 T.C. 285, 320 (1985). Petitioners have the burden of proving that they are entitled to a larger charitable contribution than respondent allowed in his notice of deficiency. Welch v. Helvering, 290 U.S. 111, 78 L. Ed. 212, 54 S. Ct. 8 (1933); Rule 142(a). Petitioners contend that the fair market value of Boerum Hill Rehab at the time of the donation was $ 680,120. In arriving at this figure, petitioners added $ 380,120 *521 (for value based on projection of prior profits realized), $ 20,000 (for estimated value of government funding), and $ 100,000 (for all other assets). The essence of petitioners' contention is that once Boerum Hill Rehab was acquired by BPRI, and BPRI received approval by the office of mental health through its operating certificate, it would be eligible for new government section 41.33 funding in its ownership of Boerum Hill Rehab. Additionally, medicaid funding would become available by the servicing of Boerum Hill Rehab patients through Lafayette Center. Petitioners' position is based on the anticipated increased earnings to BPRI as a result of its acquisition of Boerum Hill Rehab. Respondent argues that the fair market value of Boerum Hill Rehab was $ 100,000 based on valuation methods employed by his expert. The opinions of expert witnesses are often helpful in determining the fair market value of property contributed to charitable organizations. Winokur v. Commissioner, 90 T.C. 733, 741 (1988). However, we are not bound by the opinions or formulas proffered by expert witnesses, but we may use them to assist in deciding a value. Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), *522 affg. a Memorandum Opinion of this Court; Chiu v. Commissioner, 84 T.C. 722, 734 (1985). The Court may adopt some and reject other portions of expert reports or views. Helvering v. National Grocery Co., 304 U.S. 282, 82 L. Ed. 1346, 58 S. Ct. 932 (1938). At trial each party called one expert witness to testify as to the value of Boerum Hill Rehab. Both witnesses were qualified experts in the area of valuing business enterprises. Petitioners' expert witness, James L. Kerr (Kerr), an appraiser since March 1981, has extensive experience in the valuing of business enterprises, minority interests, and intangible assets. In addition, he is a senior member of the American Society of Appraisers. Respondent's expert witness, Ernest Gruenfeld (Gruenfeld), has been a financial analyst in the valuation section of Appeals, Internal Revenue Service, since 1979. In that capacity, he has valued closely held stock interests and business interests for various tax purposes. Gruenfeld is also a member of the Missouri bar. Kerr determined that the fair market value of Boerum Hill Rehab at the time of the donation was $ 800,000. The valuation method or approach employed by Kerr focused *523 on the present value of the projected future net cash flow accruing to the business enterprise. Kerr used financial statements of BPRI from the date of the gift through 1984 because he believed that these statements contained the best representation of anticipated revenue. He believed that the historical earnings were not relevant in determining the anticipated revenue because the potential earnings accruing after the ownership change were greater than the historical earnings. In computing the anticipated earnings or revenue, Kerr factored in the economic benefit that BPRI could derive if it received Federal and State funding as a result of the gift of Boerum Hill Rehab. Kerr also considered the income from both Boerum Hill Rehab and Lafayette Center because their operations were integrally related and combined the gross pretax gross cash flow of each facility. Gruenfeld, respondent's expert, used three methods of valuation and opined that the fair market value of Boerum Hill Rehab on the date of the gift was $ 100,000. First, Gruenfeld applied the discounted cash-flow method based upon Boerum Hill Rehab's pretax cash flow for the 5 years immediately preceding the gift. He determined *524 that the average pretax cash flow during these years was $ 36,354 a year and selected a capitalization rate of 35 percent to arrive at a fair market value of $ 103,868 ( $ 36,354 divided by 35 percent). The second valuation approach applied by Gruenfeld was the comparable company approach. Gruenfeld compared Boerum Hill Rehab's operations to those of three medical facilities, American Medical Services, Excepticon, Inc., and Geriatric and Medical Center. American Medical Services is a nursing home which provides convalescent care for senior citizens. Excepticon, Inc., provides long-term residential care for mentally retarded and developmentally disabled individuals. Geriatric and Medical Center operates a facility called Retirement Manners and serves the needs of retirement and medicare approved extended care facilities. Under the comparable company approach applied by Gruenfeld, the value of Boerum Hill Rehab was $ 66,500. Gruenfeld testified at trial that it may be appropriate to add a 50-percent premium for control to this value. On brief, respondent gave petitioners the benefit of this premium and therefore increased Gruenfeld's valuation to $ 99,750. Finally, Gruenfeld *525 concluded that the fair market value of Boerum Hill Rehab was $ 100,000 based on the value of the tangible assets transferred. In making his appraisal, Gruenfeld did not verify the facts, but relied on a set of facts provided by respondent's counsel. We find petitioners' expert's methodology to be flawed. Kerr relied on Northern Trust Co. v. Commissioner, 87 T.C. 349 (1986), to justify the use of future years to determine the value of Boerum Hill Rehab. We believe that Kerr's reliance on Northern Trust is misplaced. In Northern Trust, the taxpayer's expert witness used the market comparable approach and a discounted cash-flow approach in valuing the stock of a closely held corporation. The Court relied upon the discounted cash-flow approach used by the taxpayer's expert witness noting that the discounted cash-flow approach took into account earnings, the economic outlook of the specific industry, the financial condition of the business, and the dividend paying capacity of the business. Unlike petitioner's expert witness in this case, in Northern Trust the taxpayer's expert witness determined net cash flow by using the earnings of the 5 prior *526 years. The Court cited favorably Rev. Rul. 59-60, 1959-1 C.B. 237, stating that potential future income is a major factor to consider in valuing stock of many closely held corporations, but noted that this potential income must be projected on the basis of prior earnings records. Northern Trust Co. v. Commissioner, supra at 379-380. In his expert witness report, Kerr included in his projections the anticipated net cash flow from the Lafayette Center because Lafayette Center provided psychiatric services to Boerum Hill Rehab residents and was eligible for medicaid funding for the provision of these services. Although Lafayette Center was eligible and did receive medicaid funding by the servicing of Boerum Hill Rehab patients through Lafayette Center, we find this position to be specious. Lafayette Center was not gifted to BPRI but was already owned and operated by BPRI. Therefore, any valuation of Boerum Hill Rehab should not have included income earned from Lafayette Center. Moreover, benefits to Lafayette Center resulted in financial benefit to petitioners and their family through fees and rents. At trial and on brief, petitioners *527 stressed that Boerum Hill Rehab would be entitled to section 41.33 funding after it was acquired by BPRI. Petitioners argue that because Boerum Hill Rehab would be eligible for section 41.33 funding once it was gifted to BPRI, the anticipated increased earnings should be factored into the determination of Boerum Hill Rehab's fair market value. We do not agree with petitioners' contention. At the time of the gift, Boerum Hill Rehab was not eligible to receive section 41.33 funding. There is no indication that Boerum Hill Rehab would have applied for and would have been granted section 41.33 funding. Moreover, less than 4 months prior to the gift, petitioner husband indicated that he did not anticipate applying for section 41.33 funding. Because of this uncertainty and the fact that Boerum Hill Rehab was not, at that crucial time, eligible for section 41.33 funding, the funding should not have been factored into the valuation of Boerum Hill Rehab. [4]
*528 We find that prior to the gift, most of petitioners' income was derived from rental payments earned by Cobble Hill and residents' payments from operation of Boerum Hill Rehab. However, the for-profit operation of Boerum Hill Rehab did not provide petitioners with adequate income since government funding was not available; therefore, petitioner husband devised a plan to transfer ownership to a nonprofit, related organization so that medicaid and State aid would become available. Petitioners were in control [5] of Boerum Hill Rehab and BPRI before and after the transfer. The agreement was consummated only because petitioners controlled the parties on both sides. Moreover, petitioners retained an interest in Boerum Hill Rehab and the ultimate benefits from any financial improvement to the interrelated entities.
There are also certain weaknesses with the valuation provided by respondent's witness. First, it was elicited during cross-examination that Gruenfeld did not physically inspect the Boerum Hill Rehab program and did not inspect the particular companies evaluated under the comparable company approach but simply relied on information provided by respondent's counsel. Additionally, *529 Gruenfeld's final estimation of $ 100,000 was based only on the value of Boerum Hill Rehab's tangible assets. We believe that Boerum Hill Rehab had some going-concern value. Going-concern value has been defined as "the additional element of value which attaches to property by reason of its existence as an integral part of a going concern." VGS Corp. v. Commissioner, 68 T.C. 563, 591 (1977); Conestoga Transportation Co. v. Commissioner, 17 T.C. 506, 514 (1951). Going-concern value is related "to the operating relationship of assets and personnel inherent in an ongoing business" and is manifested by the business' ability to resume business without interruption after an acquisition. UFE, Inc. v. Commissioner, 92 T.C. 1314, 1323 (1989). Under New York State law, a community residence for the mentally ill cannot be operated without an operating certificate and an operating certificate cannot be transferred from a previous owner to a new owner. However, petitioner testified that the standard procedure upon a transfer of ownership is for the parties to complete a transfer of ownership application and once the ownership has *530 been transferred, a new operating certificate is automatically issued and the old operating certificate is destroyed. Prior to the gift, there were 196 Boerum Hill Rehab residents. Because an operating certificate would likely have been issued upon a transfer of ownership and at the time of the gift and with 196 Boerum Hill Rehab residents in place, there was some going-concern value. We, therefore, believe that the fair market value of Boerum Hill Rehab exceeded $ 100,000, the value of its tangible assets. We believe that Gruenfeld's determination that the average pretax cash flow during the 5 years immediately preceding the gift was $ 36,354 provides a reasonable estimate. However, Gruenfeld selected a capitalization rate of 35 percent primarily because petitioners reported a $ 79,336 pretax loss on their return for Boerum Hill Rehab's 1979 taxable year. Our evaluation of the facts leads to the conclusion that a capitalization rate of 25 percent should have been used. Accordingly, the value of Boerum Hill Rehab at the time of the gift was $ 145,416 ( $ 36,354 divided by 25 percent). Respondent determined that petitioners are liable for additions to tax for valuation overstatements *531 under section 6659 for taxable years 1981 and 1982. Under section 6659(c), a valuation overstatement exists if the value of any property claimed on a return is 150 percent or more of the amount determined to be the correct valuation of such property. The section 6659 addition to tax applies only where the underpayment attributable to the valuation overstatement is at least $ 1,000. Sec. 6659(d). Petitioner has the burden of proving that the addition to tax was erroneously determined by respondent. Welch v. Helvering, 290 U.S. 111, 78 L. Ed. 212, 54 S. Ct. 8 (1933); Rule 142(a). Petitioners presented no arguments at trial, or on brief, relating to the section 6659 addition to tax. We have already held that the value of Boerum Hill Rehab on the date of the gift was $ 145,416, Because $ 680,120 is more than 150 percent of $ 145,416, respondent's determination that petitioners are liable for the section 6659 addition to tax is sustained.[6]
*532 The final issue which the Court must address is whether petitioners' entire underpayments for taxable years 1981 and 1982 are substantial understatements attributable to a tax-motivated transaction under section 6621(c). Section 6621(c) provides for a rate of 120 percent of the underpayment rate established under section 6621. To be subject to the rate, the underpayment for a taxable year attributable to one or more tax-motivated transactions must exceed $ 1,000. Sec. 6621(c)(2). A tax-motivated transaction includes any valuation overstatement within the meaning of section 6659(c). Sec. 6621(c)(3)(A)(i). Petitioners bear the burden of proving that respondent improperly applied the rate of interest determined under section 6621(c). Welch v. Helvering, supra; Rule 142(a). Petitioners presented no evidence regarding the application of section 6621(c). We have already concluded that petitioners' understatements for 1981 and 1982 were due to valuation overstatements within the meaning of section 6659. We, therefore, sustain respondent's determination that petitioners are subject to the interest rate established by section 6621(c). To reflect the foregoing, *533 Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, section references are to the Internal Revenue Code as amended and in effect for the years in issue, and Rule references are to the Tax Court Rules of Practice and Procedure. * 120 percent of the interest due on any substantial underpayment attributable to a tax motivated transaction.↩
2. Petitioners have conceded that they are not entitled to the $ 72,409 net operating loss carryover.↩
3. Center was formed and operated by Cobble Hill as a separate entity. However, the facts are unclear as to whether Cobble Hill operated Center as a subsidiary or subdivision.↩
4. We find it interesting that BPRI did in fact apply for N.Y. Mental Hyg. Law sec. 41.33 (McKinney 1988) funding for Boerum Hill, but the application was not approved. We note, however, that the failure to obtain the section 41.33↩ funding did not impact our conclusion.
5. The term "control" is not used in the more technical sense. It is used in a practical vein with the connotation that petitioners were involved in the operations and management of the related entities. For example, prior to the give, petitioner wife was the proprietor of Boerum Hill Rehab, and petitioner husband was the founder and a paid consultant to Boerum Hill Rehab. Petitioner husband was BVRI's executive director. After the gift, petitioner husband was a paid consultant to BPRI's board of directors. He was medical director of Lafayette Center.↩
6. Because we have found petitioners liable for the addition to tax under sec. 6659↩, we need not address respondent's alternate argument that petitioners are liable for the addition to tax under sec. 6661 for the substantial understatement of income tax for 1982.