THOMAS J. BAKER AND PATRICIA A. BAKER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Baker v. Commissioner
Docket No. 32520-87
United States Tax Court
T.C. Memo 1990-263; 1990 Tax Ct. Memo LEXIS 282; 59 T.C.M. (CCH) 698; T.C.M. (RIA) 90263; May 30, 1990, Filed *282 Decision will be entered under Rule 155. Monte A. Jackel and Allan B. Solomon, for the petitioners. William B. McCarthy and Sergio Garcia-Pages, for the respondent. SWIFT, Judge. SWIFT
*961 MEMORANDUM FINDINGS OF FACT AND OPINION By notice of deficiency, respondent determined deficiencies in petitioners' joint Federal income tax and additions to tax as follows: Additions to Tax or Interest, I.R.C. Secs. [1]
Year
Deficiency
6659
6621(c)
1983
$ 73,193.00
$ 21,957.90 *
1984
34,680.51
19,891.96 *
The primary issue for decision is the fair market value of videotapes of medical symposia. Also at issue are the additions to tax and interest. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners are husband and wife and resided in Miami, Florida, when they filed their petition. Unless otherwise indicated, all references to petitioner are to Thomas J. Baker. *283 In 1967, petitioner and Howard L. Gordon, both respected plastic surgeons, began organizing and conducting annual medical symposia in Miami, Florida. The symposia featured lectures and live medical operations performed by well-known plastic surgeons from the United States, Europe, and South America. The symposia were among the first medical symposia of their kind and were well attended. Beginning in 1973, the lectures and operations performed at the symposia were videotaped. The videotapes were made to enable physicians attending the symposia to review operating techniques demonstrated at the symposia and to provide educational material for medical doctors not attending the symposia. In July of 1975, petitioner and Mr. Gordon formed Cosmetic Surgery Symposia, Inc. ("CSS"), a Florida corporation, for the purpose of organizing and managing the symposia and the videotaping activities. At the time of incorporation, petitioner and Mr. Gordon contributed to CSS the medical videotapes produced at the symposia in 1973, 1974, and in 1975, prior to forming CSS. Petitioner and Mr. Gordon each owned 50 percent of the stock of CSS. Petitioner, Mr. Gordon, and CSS obtained releases and permission *284 from all physicians and patients participating in the symposia to videotape the lectures and operations. The crew of a local television station was hired to perform the videotaping. Videotapes of lectures were 30 to 60 minutes in length. Videotapes of medical operations generally were 1 to 4 hours in length. The videotapes, with perhaps one exception, were not edited, and none of the videotapes reflected exceptional production quality. CSS currently expensed the costs of producing the videotapes, including transportation, lodging, and meal costs of physicians lecturing and performing operations at the symposia. Consequently, the videotapes had no book value and were not included on the balance sheets of CSS. In 1982, a video tape entitled "Chemical Peel" (that had been produced by petitioner in 1972) apparently was contributed by CSS or by petitioners and Mr. Gordon to the Plastic Surgery Educational Foundation ("the PSE Foundation"), the educational affiliate of The American Society of Plastic and Reconstructive Surgery. The PSE Foundation then became interested in cosponsoring the CSS symposia, in acquiring videotapes produced at prior symposia, and in acquiring videotapes to *285 be produced in subsequent years. The PSE Foundation is a section 501(c)(3) exempt organization. During 1982, the PSE Foundation apparently received some income from the sale and rental of the "Chemical Peel" videotape. With the exception of the "Chemical Peel" videotape, none of the videotapes produced prior to 1983 were copyrighted and prior to November of 1983 no *962 effort was made to sell or rent any of the other videotapes. By November of 1983, a total of 89 videotapes had been produced at the symposia. Of the 89 videotapes, 81 were videotapes of medical operations and 8 were videotapes of medical lectures. On November 4, 1983, petitioners and Mr. Gordon contributed as charitable contributions their stock interests in CSS to the PSE Foundation. At the time of the contributions, the only significant assets of CSS were the remaining 88 videotapes produced at the various symposia from 1975 through November of 1983. On November 5, 1983, petitioner and Mr. Gordon entered into a written agreement with CSS to co-sponsor the plastic surgery symposium to be held in January of 1984, and to videotape the medical lectures and operations that were to be conducted at the symposium. Under the *286 terms of the agreement, brochures and other materials disseminated with regard to the symposium were to reflect the fact that CSS was then owned by the PSE Foundation. Also under the terms of the agreement, petitioner and Mr. Gordon were entitled to organizing and consulting fees of 80 percent of the net proceeds realized from the symposium. Out of their fees, petitioner and Mr. Gordon were to bear the costs of producing videotapes of the lectures and operations, and they were to receive no proceeds from the sale, rent, or other distribution of the videotapes. In January of 1985, 1986, 1987, and 1988, petitioner, Mr. Gordon, CSS, and the PSE Foundation entered into similar written agreements under which petitioner and Mr. Gordon, as independent contractors, were to provide organizational, consulting, and other services in connection with the annual plastic surgery symposia sponsored by CSS and the PSE Foundation. Under the terms of these agreements, expenses of producing and editing videotapes at the symposia in 1985 and subsequent years were to be paid by CSS. Petitioner and Mr. Gordon each were to receive a base fee of 40 percent of the net proceeds of the symposia in return *287 for their services in organizing the symposia, and they also each were to receive additional fees of 10 percent of the net proceeds received from the sale, rent, or other distribution of the videotapes for a stated number of years. In years following the contributions of the stock of CSS to the PSE Foundation, CSS realized net income and petitioner and Mr. Gordon received base fees from the annual symposia as follows: Petitioner's and
CSS's
Mr. Gordon's
Year
Net Income
Base Fees
1984
$ 4,798
$ 22,683
1985
13,888
92,164
1986
19,721
83,278
1987
21,659
40,305
1988
25,000
--
After the stock of CSS was contributed to the PSE Foundation, the audio-visual committee of the PSE Foundation reviewed 12 of the videotapes owned by CSS. The committee selected 4 of the 12 videotapes to market based on the fact that in their unedited state they were of a length most suitable for medical educational videotapes (i.e., 30 to 50 minutes). One of the four videotapes selected for marketing was the videotape entitled "Chemical Peel." The PSE Foundation placed the remaining 85 videotapes it acquired in 1983 (though acquisition of the stock of CSS) in an archive at Harvard University's Library for Medicine. Unedited, the four *288 videotapes the PSE Foundation selected to market generated sales and rental revenue as follows: No. of
No. of
Sales
Rental
Year
Sales
Rentals
Revenue
Revenue
1983
11
13
$ 1,375
$   585 1984
4
6
500
270 1985
64
7
8,000
315 1986
16
72
2,000
3,240 1987
27
53
3,375
2,385 With the exception of the "Chemical Peel" videotape, the videotapes were not copyrighted. Sales and rentals of the four videotapes were subject to contractual restrictions forbidding purchasers and renters from distributing, loaning, renting, selling, or otherwise making the videotapes available to third parties without specific written permission. In 1983, the cost of producing each unedited videotape at the symposium was approximately $ 3,000, and the additional cost of editing each *963 videotape would have been approximately $ 4,500. The number of videotapes the PSE Foundation could edit was limited by its budget and by the available time of physicians who performed the editing. Currently, four videotapes a year are edited. At the symposia held in 1985 through 1987, approximately 16 videotapes were produced. These tapes have been edited and have generated total sales and rental revenue in each year as follows: Year
Revenue
1985
$     853
1986
20,857
1987
151,974
Physicians *289 other than petitioner and Mr. Gordon have contributed videotapes to the PSE Foundation. However, other videotapes contributed to the PSE Foundation generally were edited prior to being contributed. The library of medical videotapes maintained by the PSE Foundation, not including those placed in archives, contains over 100 titles. Using a membership mailing list, the PSE Foundation markets the videotapes by distributing a number of times each year a catalog describing the videotapes to approximately 2,600 plastic surgeons in the United States. In March of 1988, the PSE Foundation apparently liquidated CSS. Petitioners treated the fair market value of the CSS stock they contributed to the PSE Foundation in 1983 as being equal to the fair market value they determined for the 89 videotapes, the only tangible assets of CSS. In valuing the videotapes, petitioners devised a rating system in which they rated the videotapes on a scale of one to four based on factors including the age of the videotapes, the reputations of the surgeons featured on the videotapes, the perceived historical and commercial value of the tapes, and the quality of the tapes. Petitioners rated the videotapes and *290 assigned fair market values to the videotapes as follows: Rating
Value
No. of Videotapes
Total Value
1
$ 7,500
63
$ 472,500  2 5,000
19
95,000  3 3,500
4
14,000  4 2,500
3
7,500  $ 589,000  On their joint Federal income tax return for 1983, petitioners, with respect to their contribution of the stock of CSS to the PSE Foundation, reported a charitable contribution of a capital asset with a fair market value of $ 294,500 (one half of the value they determined for the videotapes), and, due to limitations provided in section 170, petitioners claimed a charitable contribution deduction in the amount of $ 155,334. On their joint Federal income tax return for 1984, petitioners claimed a carryover charitable contribution deduction in the amount of $ 139,166 for the portion of the CSS stock contribution carried over from the 1983 tax return. On January 5, 1987, in conjunction with an appraisal report petitioners obtained, petitioners filed Forms 1040X Amended Federal income tax returns for 1983 and 1984, on which petitioners reported a revised fair market value of $ 225,000 for their portion of the CSS stock contributed to the PSE Foundation and on which petitioners reduced the amount of the charitable *291 contribution deduction and carryover deduction they claimed with respect to the CSS stock to $ 155,641 for 1983 and $ 69,359 for 1984. On audit, respondent determined that the total value of the CSS stock (and of the related videotapes) that petitioners contributed to the PSE Foundation was $ 5,000, and respondent adjusted petitioners' income in 1983 and 1984 accordingly. In his answer, respondent alleged (as an alternative ground for disallowing the charitable contribution deductions claimed by petitioners for 1983 and 1984) that the property petitioners actually contributed to the PSE Foundation was, in substance, one half of the ownership interest in the videotapes, not one half of the stock of CSS, and that in determining the amount of the charitable contribution deductions under section 170(e)(1)(a) the fair market value of the videotapes must be reduced by the amount of gain which would not have been long-term capital gain if the videotapes had been sold at their fair market value at the time the contribution was made. At trial, expert witnesses were called to testify as to the value of the charitable contributions at issue. In conjunction with his expert witness' opinion, respondent *292 reevaluated his audit determination of the value of petitioners' charitable contribution to the PSE Foundation and increased the value thereof to $ 20,750. On brief, respondent concedes that the property petitioners contributed to the PSE Foundation was the 50-percent stock interest in CSS, the principal assets of which were the videotapes. *964 OPINION In general, section 170 allows deductions for contributions to or for the use of charitable organizations. Charitable organizations are defined in section 170(c) by reference to section 501(c)(3). Where charitable contributions are made in property other than money, the amount of charitable contributions is the fair market value of the contributed property as of the date the contributions are made, with certain reductions not applicable here. Sec. 170(e); sec. 1.170A-1(c)(1), Income Tax Regs.
Fair market value is the price at which property would change hands between a willing buyer and seller, neither being under any compulsion to buy or sell, and both having reasonable knowledge of all relevant facts. Sec. 1.170A-1(c)(2), Income Tax Regs.; United States v. Cartwright, 411 U.S. 546, 551 (1973); Anselmo v. Commissioner, 80 T.C. 872, 880 (1983), *293 affd. 757 F.2d 1208 (11th Cir. 1985). Fair market value involves a factual question to be resolved from the entire record. Skripak v. Commissioner, 84 T.C. 285, 320 (1985). Some of the factors relevant in the determination of the fair market value of property contributed to charitable organizations include: (1) The use to which the property is put before and after the contributions (or, by inference, the failure to put the property to a particular use), Chiu v. Commissioner, 84 T.C. 722, 736 (1985); Skripak v. Commissioner, 84 T.C. at 322-323; (2) the original cost of the property contributed by the taxpayers, see Guggenheim v. Rasquin, 312 U.S. 254, 258 (1941); see also Chiu v. Commissioner, 84 T.C. at 735-736; and (3) evidence of sales or rental of the contributed property near the date of the contributions, Estate of Kaplin v. Commissioner, 748 F.2d 1109, 1111 (6th Cir. 1984), revg. and remanding a Memorandum Opinion of this Court; Chiu v. Commissioner, 84 T.C. at 735. The opinions of expert witnesses are often helpful in determining the fair market value of property contributed to charitable organizations. Winokur v. Commissioner, 90 T.C. 733, 741 (1988). However, we are not *294 bound by the opinions or formulas proffered by expert witnesses, and we may reach a determination of value based upon our analysis of the entire record. Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. a Memorandum Opinion of this Court; Chiu v. Commissioner, 84 T.C. at 734. Taxpayers bear the burden of proving the value of property contributed to charitable organizations. Rule 142(a). In this case, the experience of each party's expert witness is significantly different, and their opinions are widely disparate in both analysis and conclusion. Petitioners' expert witness has expertise valuing stock of closely held corporations, but he does not have experience in the fields of medicine or educational videotapes. Petitioners' expert suggests that because many consumers experienced an increase in disposable income in November of 1983, more people were likely to spend money for the services of plastic surgeons which theoretically would increase interest within the medical community for the subject videotapes. Petitioners' expert also suggests that declining interest rates at the time of the contribution made investments in stocks (such as the stock of CSS), bonds, *295 and fixed rate certificates of deposits attractive. Petitioners' expert also suggests that the market for educational videotapes of plastic surgery procedures has tremendous potential. Using a rating system for the videotapes, an estimated sales price for each videotape of $ 150, total editing costs for 37 videotapes of $ 148,000, and marketing and other costs equal to 20 percent of gross revenue, petitioners' expert rated 81 of the videotapes and projected operating and net income from the marketing of the videotapes for a three-year period as follows: Gross
Editing
Other
Operating
Grade
Revenues
Costs
Costs
Profits
A
$ 337,500
$  28,000
$ 67,500
$ 242,000 B
262,500
40,000
52,500
170,000 C
375,000
80,000
75,000
220,000 D
--
--
2,000
(2,000)
Totals
$ 975,000
$ 148,000
$ 197,000
$ 630,000 Less Estimated Taxes (169,515)
Net Income $ 460,485 *965 Petitioners' expert also projected a total residual value for the videotapes after three years of $ 87,000, discounted the projected net income for the three-year period by an opportunity cost factor, and determined that all of the videotapes had a fair market value of $ 450,000 at the time the contributions were made by petitioners and Mr. Gordon. Petitioners' expert used this *296 amount for the value of the CSS stock that petitioners and Mr. Gordon contributed to the PSE Foundation. In determining the value of the 89 medical videotapes, respondent's expert, who is experienced in the production, marketing, and distribution of educational videotapes, concluded: (1) That each videotape had an intrinsic historical value of only $ 100; (2) that the videotapes would maintain their continuing educational value for, at most, three years; (3) that because the videotapes (with the exception of the videotape entitled "Chemical Peel") were not copyrighted they constituted property in the public domain and retained little value to CSS; (4) that the videotapes were not particularly effective learning vehicles because they were not viewer interactive (i.e., there were no learning exercises for viewers to perform while watching the videotapes); (5) that the videotapes would become obsolete within five years due to advancements in medical technology and techniques; and (6) that the videotapes, in their unedited condition, were of low quality and generally would require significant and expensive editing in order to be marketable. Based on the conclusions mentioned above and *297 on the income the PSE Foundation received from marketing four of the videotapes, respondent's expert determined that as of the time of the contributions in November of 1983 the fair market value of the four marketed videotapes was $ 33,000 and the fair market value of the 85 archived videotapes was $ 8,500, for a total fair market value of $ 41,500. This amount was used by respondent for the value of the CSS stock donated to the PSE Foundation. We find weaknesses in the qualifications and methodology of each expert witness. Petitioners' expert has no experience in the fields of medicine, the manufacture and marketing of educational medically related videotapes, or the valuation of such videotapes. His valuation is based on overly optimistic and speculative revenue projections for the videotapes which assume an unrealistically large potential customer base, improbable editing of the videotapes at a low cost, and unrealistic marketing of the videotapes. The projections are unreasonably based on the assumption of steady sales for each marketable videotape for a period of 10 years. Petitioners' expert also erroneously treated 40 of the archived videotapes as marketable primarily because *298 the audiovisual committee of the PSE Foundation determined that 33 percent (i.e., 4 out of 12) of the videotapes it sampled, it considered to be marketable. Although some of the archived videotapes may have been marketable, we believe the number of such videotapes to be relatively low. We note that in the years since 1983, the PSE Foundation has never retrieved and marketed any of the archived videotapes. We also disagree with some aspects of the analysis of respondent's expert. He fails to give sufficient historical value to the four marketed videotapes. He overemphasizes the failure by CSS to copyright the videotapes, and he uses revenue figures for the four marketed videotapes that are misleading and inaccurate because CSS made each of the four videotapes available for sale or for rent at different times during the years 1984 through 1987. We accept the position of the parties and their experts that the value of the 88 [2] videotapes determines the value of the stock of CSS that was contributed to the PSE Foundation. The videotapes at issue had a limited market, consisting primarily of plastic surgeons and institutions that teach plastic surgery. Few organizations distributed such *299 videotapes and, with the exception of some limited historical value, the videotapes generally would have significant value only when edited and aggressively marketed. The videotapes did not reflect exceptional production quality. Editing costs would have been significantly higher than projected by petitioners' expert, and, based on circumstantial inferences we have drawn from the evidence, many of the archived videotapes appear to have had insufficient educational or commercial value to justify editing and marketing. Based on all of the evidence, we hold that the videotapes and accordingly the stock in CSS had a fair market value of $ 100,000 at the time petitioners and Mr. Gordon contributed the stock to the PSE Foundation. Petitioners contributed one half of the stock with a fair market value at the time of the contribution of $ 50,000. Additions To Tax and Interest
Petitioners argue that the additions to tax under section 6659 *300 and the increased interest rate under section 6621(c) should not apply to the underpayments in tax determined in this *966 case for 1983 and 1984. With respect to 1983, respondent concedes that section 6659(c)(2), as in effect for 1983, excepted from the application of the addition to tax for valuation overstatements property that taxpayers had held for more than five years prior to the time of the contribution. Because petitioners had held that their stock in CSS for more than five years at the time it was contributed to the PSE Foundation, respondent concedes the inapplication to petitioners' 1983 tax year of both the section 6659 addition to tax and the section 6621(c) increased interest rate. [3] *301 In making these concessions, however, with respect to petitioners' 1983 tax returns, respondent, does not concede that the exception set forth in section 6659(c)(2) with respect to property held for more than five years is part of the "definition of a valuation overstatement" under section 6659(c), as in effect for 1983. With respect to their 1984 Federal income tax return, petitioners (1) implicitly argue that the carryover charitable contribution deduction claimed on their 1984 tax return did not constitute an independent overstatement of the value of the charitable contribution property, (2) that the carryover deduction on their 1984 return represented merely a mechanical calculation with respect to a statement as to the value of the property made on an earlier year's return (i.e., on petitioners' 1983 tax return) and (3) that therefore there was no valuation ovarstatement made on petitioners' 1984 tax return. Petitioners then argue that the exception in section 6659(c)(2), as in effect for 1983, for property held for more than five years was part of thte section 6659(c) "definition of a valuation overstatement," an that therefore there was no valuation overstatement on petitioners' 1983 tax return, and that application *302 of the section 6659 addition to tax to petitioners' tax return for 1984 (when application of such addition to tax to petitioners' 1983 tax return is not proper) would constitute an impermissible retroactive application of the provisions of section 6659 and section 6621(c), as amended in 1984 and as made effective for tax returns filed after December 31, 1984. In Stanley Works v. Commissioner, 87 T.C. 389 (1986), we recently addressed and rejected the same arguments made by petitioners herein with respect to the imposition of section 6659 additions to tax and the section 6621(c) increased interest rate, and our holding therein is controlling on these issues. In Stanley, we analyzed in detail the statutory scheme of sections 6659 and 6621(c) before and after their amendment in 1984 by the Deficit Reduction Act of 1984, sec. 155(c)(1)(A) and sec. 144(a) and (c), Pub. L. 98-369, 98 Stat. 682, and we expressly concluded therein, among other things, that the exception under section 6659(c)(2) for property held for more than five years was not part of the "definition of a valuation overstatement" in section 6659(c), as originally enacted and in effect in 1983 or as subsequently amended and *303 in effect for returns filed after December 31, 1984. Stanley Works v. Commissioner, 87 T.C. at 413-421. See also Nielsen v. Commissioner, 87 T.C. 779, 782 (1986), and Staff of the Joint Committee on Taxation, General Explanation of the Economic Recovery Tax Act of 1981, at 335 (J. Comm. Print 1981).[4]
Based on our interpretation of the language of sections 6659 and 6621(c) as set forth in Stanley Works v. Commissioner, supra, and on our holding herein as to the value of the property petitioners contributed to the PSE Foundation, we conclude that valuation overstatements did occur on petitioners' 1983 original and amended joint Federal income tax returns with respect to the value of the contributed property at issue in this case and that such valuation overstatements as carried forward *304 by petitioners and reflected on petitioners' 1984 original and amended joint Federal income tax returns support the imposition of the section 6659 addition to tax and the section 6621(c) increased interest rate that respondent determined with respect to 1984. We so hold. Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and as in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. Section 6621(c) was formerly section 6621(d). * 120 percent of the interest due on the deficiency.↩
2. As explained, the "Chemical Peel" videotape was contributed to the PSE Foundation in 1982 and should not be included in the determination of the value of the property contributed to the PSE Foundation in 1983. Therefore, we value 88, not 89 videotapes.↩
3. As explained in Stanley Works v. Commissioner, 137 T.C. 389, 410-420 (1986), petitioners' five-year holding period of the property explains respondent's concession in this case of the section 6659 addition to tax with respect to 1983, but it does not explain respondent's concession with respect to petitioners' tax liability for 1983 of the section 6621(c)↩ increased interest raite. We, however, accept respondent's concession on this issue for 1983.
4. Although the General Explanation, or "Blue Book," prepared by the staff of the Joint Committee technically is not considered "legislative history" for purposes of interpreting Federal tax statutes, the Supreme Court has relied on such a Blue Book in its analysis of a Federal tax statute in FPC v. Memphis Light, Gas & Water Div., 411 U.S. 458, 471-472↩ (1973), and we treat it as helpful but not conclusive.